Filed 4/5/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| STATE OF CALIFORNIA et al., | B330847 |
| Petitioners, | (Los Angeles County Super. Ct. No. 22STCP02964) |
| v. | |
| THE SUPERIOR COURT OF LOS ANGELES COUNTY, | |
| Respondent; | |
| ENERGY AND POLICY INSTITUTE, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDINGS in mandate.
Mitchell L. Beckloff, Judge. Petition denied.
Rob Bonta, Attorney General, Thomas S. Patterson,
Assistant Attorney General, Michelle M. Mitchell, Laura

Randles-Little and Andrew D. Day, Deputy Attorneys General, for Petitioners.

No appearance for Respondent.

Law Offices of Kelly A. Aviles and Kelly A. Aviles for Real Party in Interest.

_____

James Madison wrote in 1822, "A popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both."  (IX The Writings of James Madison (G.P. Putnam's Sons, ed. 1910) 103.)

The question before us is whether the "deliberative process privilege" precludes disclosure pursuant to the California Public Records Act (Gov. Code,[1] § 7920.000 et seq.; PRA) of entries in the calendars of the Governor's former senior advisor for energy. The requested entries reflect meetings with 10 specified entities—the California Public Utilities Commission (CPUC), electric utilities, and unions representing energy workers— during the year prior to that senior advisor's appointment to the presidency of the CPUC.  The trial court found the privilege does not override the public interest in access to these calendar entries and ordered the Governor to produce them to the requestor, real party in interest Energy and Policy Institute (EPI).  The Governor petitions this court for a writ of mandate vacating the trial court's order.

In determining whether the deliberative process privilege applies, the "key question . . . is 'whether the disclosure of materials would expose an agency's decisionmaking process in

_____

[1]  Unspecified statutory citations are to the Government Code.

2

such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions.' [Citation.]" (*Times Mirror Co. v. Superior Court* (1991) 53 Cal.3d 1325, 1342 (*Times Mirror*).) In *Times Mirror*, our Supreme Court held the deliberative process privilege barred the wholesale disclosure of five years' worth of the Governor's appointment schedules, calendars, and other records of his daily activities. The court emphasized, however, that in the appropriate case, "where the public interest in certain specific information contained in one or more of the Governor's calendars is more compelling, the specific request more focused, and the extent of the requested disclosure more limited," disclosure may be required "whatever the incidental impact on the deliberative process." (*Id.* at pp. 1345–1346.)

We conclude EPI's request is sufficiently specific, focused, and limited, and the public interest in disclosure sufficiently compelling when measured against the minimal impact on government decisionmaking, to override the deliberative process privilege. The record supports the finding that the entities specified in EPI's request are entities with which the Governor's senior energy advisor would be expected to meet regardless of the Governor's particular policy priorities. Accordingly, disclosure of records that those meetings took place, without any information as to the substance of those meetings, would reveal little if anything about the Governor's or his senior advisor's policy positions or thought processes. The record does not support that disclosing the fact that these meetings took place would discourage future meetings between the Governor's senior energy advisor and the specified entities or similar energy stakeholders. We also conclude the public has a substantial interest in knowing

3

the extent to which the current CPUC president interacted with the CPUC and the entities the CPUC regulates when she was the Governor's senior advisor for energy.

We therefore deny the writ petition.

## BACKGROUND

### 1. *EPI's PRA request*

Alice Reynolds served as the Governor's Senior Advisor for Energy from January 2019 to December 2021. The Governor appointed Reynolds to the CPUC presidency effective December 21, 2021.

On January 14, 2022, EPI submitted a PRA request to the Governor's office seeking "[t]he calendars of Alice Reynolds from January 1, 2021 through December 31, 2021." David Sapp, the Governor's Chief Deputy Legal Affairs Secretary at that time, responded to the request. He stated his office had identified responsive records, but the records "are exempt from disclosure as records that reveal the deliberative process of the Governor or his staff." Sapp cited Government Code former section 6255, *California First Amendment Coalition v. Superior Court* (1998) 67 Cal.App.4th 159, and *Times Mirror*, *supra*, 53 Cal.3d 1325.

After further correspondence between EPI and Sapp, EPI submitted a second, narrower PRA request. The second request sought "Alice Reynolds' calendar events specifically with representatives of the following entities from January 1, 2021 through December 31, 2021." The request then listed 10 entities: the CPUC, Sempra Utilities, San Diego Gas & Electric, Southern California Edison, Pacific Gas & Electric, Engineers and

4

Scientists of California Local 20, IBEW 11, IBEW 1245, IBEW 465, and IBEW 47.[2]

In a letter, Sapp again stated the Governor's office had identified records responsive to the request, but all were exempt from disclosure both "as correspondence of or to the Governor and his staff (Gov. Code, § 6254(*l*))" and "because they reveal the deliberative process of the Governor or his staff."

## 2.	*EPI's petition for writ of mandate*

EPI then filed a verified petition in the trial court for a writ of mandate directing the Governor to provide the requested records.  In the petition, EPI explained why it was seeking Reynolds' calendars.  EPI alleged that in 2020, the CPUC decided to "revisit net metering tariffs," which set compensation for electricity sold to the electricity grid by owners of rooftop solar panels.  "Throughout 2020 and 2021, intervenors, including electric utilities, filed comments and participated in workshops to inform the CPUC's development of a successor to the current net metering tariffs."  The CPUC issued a proposed decision on December 13, 2021 that, according to EPI, reduced the amount of compensation paid to owners of rooftop solar panels and imposed "a new solar-only fee."  EPI alleged these changes "created new barriers for utility customers to invest in rooftop solar and battery storage."

EPI alleged, "CPUC executives have . . . indicated that the Office of the Governor has significant involvement in CPUC decision-making.  The public thus has a significant interest in the disclosure of records reflecting Ms. Reynolds' interactions with

---

[2] IBEW is the International Brotherhood of Electrical Workers.

5

entities in the electronic utility ecosystem during her tenure at the Office of the Governor and prior to her appointment to the CPUC." EPI contended the records would show "how, in her role for the Governor, Ms. Reynolds worked with the utility groups that she now regulates as president of the CPUC." In a memorandum of points and authorities in support of its petition, EPI further contended, "Questions have been publicly raised about whether Ms. Reynolds was lobbied or swayed by the electric companies who stand to benefit from the changes [to the net metering tariffs], especially given her position within the Governor's office and the timing of her appointment to the CPUC."

In opposition, the Governor argued Reynolds' calendar entries were created through an exchange of e-mailed meeting invitations, and therefore were exempt from disclosure as " 'correspondence of and to the Governor or employees of the Governor's office" under section 7928.000, subdivision (a). The Governor further argued that under *Times Mirror* and its progeny, the calendars were protected from disclosure by the deliberative process privilege. The Governor contended, "[D]isclosing [Reynolds'] meeting invites could chill the future flow of information to the Governor."

Sapp, now the Governor's Legal Affairs Secretary, provided a declaration in support of the Governor's opposition to the writ petition. Sapp averred, "The Senior Advisor for Energy is the Governor's lead expert on all matters concerning energy policy. A member of the Governor's Cabinet Team, the Senior Advisor for Energy advises the Governor and helps craft and advance energy policy at the highest level within the Governor's Office. A key responsibility of the Senior Advisor for Energy is to engage with

interested parties—energy consumers, producers, regulators, unions, and others—to identify emerging issues, understand competing interests, and ensure that wide-ranging viewpoints are considered in the policymaking process."

Sapp further stated, "The Governor's Office treats its senior advisors' correspondence and meeting records as confidential to ensure that the Governor and his senior staff receive candid feedback from a diverse set of interested parties. If those records were made public, some parties might decline to meet with the Governor's senior staff out of concern for how the meeting might be perceived—or misperceived—by others. By the same token, a senior advisor might decline meeting with an unpopular or controversial group if doing so would prompt unproductive or distracting criticism from other groups. [¶] Similarly, the Governor has limited time and relies on his senior advisors to advance his priorities. This requires senior advisors to meet internally regarding ongoing initiatives and emerging issues, as well as to engage with interested stakeholders. Senior staff must determine which meetings to accept and how to prioritize the many competing demands on their time. By treating correspondence and meeting records as confidential, the Governor's Office ensures that the Governor's senior staff and all interested parties feel free to meet and exchange ideas or criticisms without weighing how the interaction might be perceived by third parties, and for senior advisors to support the internal decision making process effectively."

Sapp continued, "Treating correspondence and meeting records as confidential also promotes better policy by ensuring that the Governor's senior advisors have latitude to explore new or unconventional ideas. Due to competing demands on their

time, the Governor and his senior advisors must choose which meetings to accept. As a result, the mere fact that a meeting occurred reveals that the Governor or his advisors decided to explore a concept or prioritize one issue over another. Disclosing their meeting records would therefore reveal information about which issues receive heightened attention, the direction of the senior advisor's judgment on the issue, and which stakeholders are deemed to be of significance of those priority issues. Revealing that deliberative information could expose the Governor to premature public pressure to adopt—or abandon—a particular policy before it has been fully vetted. The Governor's Office avoids such outside pressures by maintaining the confidentiality of correspondence and meeting records."

Sapp also explained that Reynolds scheduled her meetings not with a "traditional written calendar," but with "Outlook, a Microsoft software product that allows users to send and receive meeting invitations via email." Reynolds or an assistant would schedule meetings "us[ing] Outlook's 'New Meeting' function to select a meeting date, time, and location (if applicable), summarize the meeting agenda (as needed), and transmit that information via email to each meeting invitee's email address."

### 3. *Trial court's ruling*

The trial court issued a tentative decision granting EPI's petition. Following a hearing, the court adopted the tentative decision as its final order.

Addressing first the correspondence exemption, the trial court found that e-mailed meeting invitations were "correspondence" and therefore exempt from disclosure. The court further found, however, that EPI had not requested meeting invitations, but only " 'calendar events,' " referring to "a

calendar entry—i.e., 'what appears on Ms. Reynolds's calendar [on Outlook or other calendaring system] when she or her assistant send out or accept a meeting invitation received by a third party.' " Quoting Sapp's declaration, the court stated those entries would contain "basic calendar information such as 'a meeting date, time, and location (if applicable), [and] summarize the meeting agenda (as needed).' " "[T]he fact that the calendar event may be preceded by a communication of letters (i.e., a meeting invitation) does not, standing alone, qualify the resulting calendar event as exempt from disclosure pursuant to the correspondence exemption."

The trial court concluded, "Based on the foregoing, [the Governor was] not authorized by the correspondence exemption to withhold the calendar events sought by [EPI], specifically the entries populated to Reynolds' Outlook calendar showing the invitees, attendees, time, date, location of a meeting, and meeting agenda (as needed). To the extent email correspondence or messages are directly viewable or accessible in a calendar event, [the Governor] may redact such information as unrequested. (§ 7922.525, subd. (b).) However, any such redactions should not include basic calendar information—date, time, attendees, location and meeting agenda (as needed)."

The trial court then addressed the deliberative process privilege. The court explained to invoke that privilege, the Governor "must show on the facts of a particular case 'the public interest in nondisclosure clearly outweighs the public interest in disclosure.' [Citations.]" (Boldface omitted.) The trial court found "some public interest in non-disclosure of the calendar events records at issue," because they "could partially reveal the 'substance or direction' of Reynold[s'] and the Governor's

9

deliberations and mental processes with respect to energy policy," and "possibly discourage stakeholders from meeting with the Governor's senior advisors in fear that they would be 'subjected to probing questions and scrutiny by the press.' (*Times Mirror*, *supra*, 53 Cal.3d at [p.] 1344.)"

The public interest in nondisclosure, the trial court found, nonetheless was "substantially less" than in *Times Mirror* and another case, *Rogers v. Superior Court* (1993) 19 Cal.App.4th 469 (*Rogers*), the former of which involved a request for five years of the Governor's calendars, and the latter of which involved a request for one year of Burbank city councilmembers' telephone records. (*Times Mirror*, *supra*, 53 Cal.3d at p. 1329; *Rogers*, at pp. 474, 480.) Whereas disclosure of the Governor's "meetings with diverse individuals can signal and disclose information about a governor's deliberative process," "Reynolds' position is solely related to energy policy." Therefore, "[t]hat Reynolds was meeting with stakeholders in the energy sector is unremarkable and does not disclose her overall thought processes given her position and its purview."

The trial court further noted EPI did not seek "a 'wholesale production' of all of the calendar events of [a] broad-based policymaker," but only calendar entries pertaining to 10 "stakeholders in energy policy," which would "not disclose the universe of other individuals with whom Reynolds met in 2021." The Governor "ha[s] not presented evidence suggesting disclosure of the calendar events at issue will reveal Reynolds' or the Governor's mental processes with respect to any specific item of legislation or policy—again, that Reynolds met with energy sector stakeholders is unremarkable given her position. Nor ha[s the Governor] presented declarations from a single energy

10

stakeholder entity suggesting the entity would be hesitant to meet with the Governor's senior advisor or comment on energy policy in the future if the calendar events are made public."

As for the public interest in disclosure, the trial court found, "The public has a substantial interest in learning the extent to which the current president of the CPUC was meeting with the CPUC and the utilities regulated by the CPUC, as a Senior Advisor to the Governor, during the year preceding her appointment." The court stated, "While that public interest may not justify a 'wholesale production' of Reynolds' calendar events for 2021, it supports a more narrowly tailored request for calendar records of meetings with the CPUC and the regulated utilities." The court cited "undisputed evidence" from a declaration submitted by EPI that, apart from the CPUC, "the entities for which [EPI] seeks calendar events are either utilities that 'would benefit directly from net metering tariffs that discouraged rooftop solar' or 'groups that were members of a public relations campaign sponsored by the utility companies . . . that supported the utilit[ies'] position on net metering."

The trial court concluded, "The court will issue a writ directing [the Governor] to produce the calendar events requested in the [PRA] request. [Citation.] [The Governor] may redact information not requested (i.e., meeting invitations) which may be viewable from the Outlook calendar entries. [¶] The court finds, and the writ shall specify, redactions of any calendar events may not include the invitees, attendees, time, date, location of the meeting, and meeting (as needed)." We address in our Discussion, part C.1, *post*, the significance of the final clause, "and meeting (as needed)," which appears to be missing a word.

11

The Governor then filed a petition for a writ of mandate in this court challenging the trial court's writ. After receiving and reviewing a preliminary opposition and reply, we issued an order to show cause and the parties submitted full briefing.

## DISCUSSION

The Governor argues the trial court erred in ruling the deliberative process privilege did not apply to the records at issue. The Governor does not challenge the trial court's conclusion that the correspondence exemption does not apply, although he emphasizes he does not concede that point.

### A.    The PRA

"The PRA and the California Constitution provide the public with a broad right of access to government information." (*Los Angeles County Bd. of Supervisors v. Superior Court* (2016) 2 Cal.5th 282, 290 (*Bd. of Supervisors*).) "Modeled after the federal Freedom of Information Act (5 U.S.C. § 552 et seq.), the PRA was enacted for the purpose of increasing freedom of information by giving members of the public access to records in the possession of state and local agencies. [Citation.] Such 'access to information concerning the conduct of the people's business,' the Legislature declared, 'is a fundamental and necessary right of every person in this state.' [Citation.]" (*Bd. of Supervisors*, at p. 290.) " '[A]ll public records are subject to disclosure unless the Legislature has expressly provided to the contrary.' [Citation.]" (*American Civil Liberties Union Foundation v. Superior Court* (2017) 3 Cal.5th 1032, 1038–1039 (*American Civil Liberties Union Foundation*).)

Via ballot initiative, "voters enshrined the PRA's right of access to information in the state Constitution: 'The people have

12

the right of access to information concerning the conduct of the people's business, and, therefore, . . . the writings of public officials and agencies shall be open to public scrutiny.' (Cal. Const., art. I, § 3, subd. (b)(1).) As amended by the initiative, the Constitution also directs that statutes 'shall be broadly construed if it furthers the people's right of access, and narrowly construed if it limits the right of access.' (Cal. Const., art. I, § 3, subd. (b)(2).)" (*Bd. of Supervisors*, *supra*, 2 Cal.5th at pp. 290–291.)

"Despite the value assigned to robust public disclosure of government records both in the California Constitution and in the PRA," there nonetheless are statutory exceptions to disclosure. (*Bd. of Supervisors*, *supra*, 2 Cal.5th at p. 291.) The PRA contains express exemptions for certain categories of records; for example, the Governor here invoked below the exemption for "correspondence of and to the Governor or employees of the Governor's office," currently codified at section 7928.000, subdivision (a). There is also a "catchall exemption," section 7922.000 (formerly section 6255), that permits a public agency to withhold records if it can demonstrate "on the facts of the particular case the public interest served by not disclosing the record clearly outweighs the public interest served by disclosure of the record." (See *Iloh v. Regents of University of California* (2023) 87 Cal.App.5th 513, 523–524.)

As will be discussed, the deliberative process privilege is not an express exemption, but an application of the PRA's catchall provision. (See *Times Mirror, supra*, 53 Cal.3d at p. 1339.) When analyzing the trial court's application of that provision, "we review the public interest factors de novo but accept the trial court's factual findings as long as substantial

13

evidence supports them." (*American Civil Liberties Union Foundation*, *supra*, 3 Cal.5th at p. 1043; see *Times Mirror*, at p. 1336 [independently reviewing trial court's PRA ruling].)

## B.    The Deliberative Process Privilege

In asserting the deliberative process privilege, the Governor relies on *Times Mirror*, *Rogers*, and a third case, *Labor & Workforce Development Agency v. Superior Court* (2018) 19 Cal.App.5th 12 (*Labor & Workforce Development Agency*).  We summarize each below.

### 1.    *Times Mirror*

In *Times Mirror*, the Los Angeles Times sought injunctive and declaratory relief under the PRA after the Governor declined its request for " 'appointment schedules, calendars, notebooks and any other documents that would list [the Governor's] daily activities as governor from [his] inauguration in 1983 to the present,' " a period of five years. (*Times Mirror*, *supra*, 53 Cal.3d at p. 1329.)  The Governor asserted numerous bases for refusing to disclose the requested records, including the PRA's catchall provision, at that time former section 6255. (*Times Mirror*, at p. 1329.)  Specifically, the Governor contended release of his calendars and schedules would "inhibit the free and candid exchange of ideas necessary to the decisionmaking process."[3] (*Times Mirror*, at p. 1329.)

---

[3] The Governor further contended the public interest in nondisclosure outweighed the interest in disclosure because release of the records would create a risk to his personal security, an argument with which our Supreme Court agreed.  (*Times Mirror*, *supra*, 53 Cal.3d at pp. 1329, 1346–1347.)  In the instant

14

In support of his position, the Governor submitted a declaration that, inter alia, "[e]laborat[ed] upon the potentially adverse consequences of disclosure on the decisionmaking process." (*Times Mirror*, *supra*, 53 Cal.3d at p. 1331.) "[T]he Governor noted that his office requires him to meet with people of wide-ranging views on a multiplicity of subjects. Because of the frequent sensitivity of the subjects under discussion, 'it is necessary,' he stated, 'that the meetings themselves be fundamentally private, so that those present may feel free to express their candid opinions to me and so that I can be assured of the candor of their expressions. . . .' Routine disclosure of the identities of the persons with whom the Governor meets, he asserted, would inhibit the deliberative process, in some instances by discouraging persons from attending meetings, in others by leading to unwarranted inferences about the subject under discussion. Furthermore, the Governor argued, although the calendars and schedules contain 'facts' rather than opinions or advice, they necessarily reflect the Governor's 'deliberative judgment' as to those persons, issues or events he considers to be of sufficient significance to occupy his time, and those he does not." (*Id.* at pp. 1331–1332.)

To assess the Governor's claim of what our high court referred to as the "deliberative process or 'executive' privilege," the court looked to federal cases interpreting exemption 5 of the Freedom of Information Act (5 U.S.C. § 552(b)(5)), which protects from disclosure " 'inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than

proceeding, the Governor does not contend release of Reynolds' calendars would create a security risk.

15

an agency in litigation with the agency.' " (*Times Mirror*, *supra*, 53 Cal.3d at pp. 1339–1340 & fn. 11.)  The court stated that Congress, in adopting exemption 5, was concerned "that 'frank discussion of legal or policy matters' might be inhibited if 'subjected to public scrutiny,' and that 'efficiency of Government would be greatly hampered' if, with respect to such matters, government agencies were 'forced "to operate in a fishbowl." ' [Citations.]" (*Id.* at p. 1340.)  "[T]he courts' focus in exemption 5 cases is less on the nature of the records sought and more on the effect of the records' release.  The key question in every case is 'whether the disclosure of materials would expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions.' [Citation.]" (*Id.* at p. 1342.)

Applying these principles, the court held, "Disclosing the identity of persons with whom the Governor has met and consulted is the functional equivalent of revealing the substance or direction of the Governor's judgment and mental processes; such information would indicate which interests or individuals he deemed to be of significance with respect to critical issues of the moment.  The intrusion into the deliberative process is patent." (*Times Mirror*, *supra*, 53 Cal.3d at p. 1343.)  Further, "[i]f the law required disclosure of a private meeting between the Governor and a politically unpopular or controversial group, that meeting might never occur.  Compelled disclosure could thus devalue or eliminate altogether a particular viewpoint from the Governor's consideration.  Even routine meetings between the Governor and other lawmakers, lobbyists or citizens' groups might be inhibited if the meetings were regularly revealed to the public and the participants routinely subjected to probing questions and

16

scrutiny by the press." (*Id.* at p. 1344.) "[W]hile the raw material in the Governor's appointment calendars and schedules is factual, its essence is deliberative. Accordingly, we are persuaded that the public interest in withholding disclosure of the Governor's appointment calendars and schedules is considerable." (*Ibid.*)

The court then turned to the question of whether the public interest in nondisclosure clearly outweighed the public interest in disclosure. (*Times Mirror*, *supra*, 53 Cal.3d at p. 1344.) The Los Angeles Times argued, " '[I]n a democratic society, the public is entitled to know how [the Governor] performs his duties, including the identity of persons with whom he meets in the performance of his duties as Governor.' " (*Ibid.*) The court acknowledged, "The public's interest extends not only to the individual they elect as Governor, but to the individuals their Governor selects as advisors"—that is, the individuals with whom the Governor chooses to consult. (*Ibid.*) Also, "[i]t could be argued . . . that the prospect of publicity would expand rather than contract the number and variety of persons meeting with the Governor," and "[d]isclosure might . . . reveal whether the Governor was, in fact, receiving a broad range of opinions" and "attending diligently to the public business." (*Id.* at pp. 1344–1345.) The court noted some might question whether "the Governor, or those otherwise inclined to confer with the Governor, would be deterred by the mere specter of publicity." (*Id.* at p. 1345.)

"The answer to these arguments," wrote the court, "is not that they lack substance, but pragmatism. The deliberative process privilege is grounded in the unromantic reality of politics; it rests on the understanding that if the public and the Governor

17

were entitled to precisely the same information, neither would likely receive it." (*Times Mirror*, *supra*, 53 Cal.3d at p. 1345.) "To disclose *every* private meeting or association of the Governor and expect the decisionmaking process to function effectively, is to deny human nature and contrary to common sense and experience." (*Ibid.*) "Furthermore, whatever merit disclosure might otherwise warrant in principle is simply crushed under the massive weight of the Times's request in this case: the newspaper seeks almost five years of the Governor's calendars and schedules, covering undoubtedly thousands of meetings, conferences and engagements of every conceivable nature. We are not persuaded that any identifiable public interest supports such a wholesale production of documents. [¶] Accordingly, on the present record, we conclude that the public interest in nondisclosure clearly outweighs the public interest in disclosure." (*Ibid.*)

The court concluded by cabining the scope of its holding: "Lest there be any misunderstanding, however, we caution that our holding does not render inviolate the Governor's calendars and schedules or other records of the Governor's office. There may be cases where the public interest in certain specific information contained in one or more of the Governor's calendars is more compelling, the specific request more focused, and the extent of the requested disclosure more limited; then, the court might properly conclude that the public interest in nondisclosure does *not* clearly outweigh the public interest in disclosure, whatever the incidental impact on the deliberative process. Plainly, that is not the case here." (*Times Mirror, supra*, 53 Cal.3d at pp. 1345–1346.)

18

### 2. *Rogers*

In *Rogers*, a freelance writer and newspaper columnist submitted a request for "telephone records of calls made and received by [Burbank] city council members from cellular phones and made from second telephones in home offices maintained by two city council members." (*Rogers*, *supra*, 19 Cal.App.4th at p. 474.) The writer contended disclosure served the public interest because " '[o]n several occasions, Burbank City Council members and high-level staffers have denied contact with specific individuals who are alleged to wield considerable influence in the conduct of City business. The requested telephone records will provide significant confirmation—or evidence contrary—to those claims. In either scenario, the public has a right to know whether certain individuals or interests are influencing their elected officials.' " (*Id.* at p. 477.)

Burbank provided the writer with the requested phone bills but redacted the telephone numbers. (*Rogers*, *supra*, 19 Cal.App.4th at p. 474.) When the writer filed a complaint under the PRA, the trial court ruled in favor of Burbank, citing, inter alia, the deliberative process privilege. (*Id.* at p. 475.)

The Court of Appeal upheld the trial court's ruling, concluding that the facts of the case were "indistinguishable from *Times Mirror*." (*Rogers*, *supra*, 19 Cal.App.4th at p. 479.) "Disclosing the telephone numbers of persons with whom a city council member has spoken discloses the identity of such persons and is 'the functional equivalent of revealing the substance or direction' of the judgment and mental processes of the city council member. [Citation.] There is no meaningful distinction between the appointment calendars and schedules of the Governor and the telephone bills of a city council member. In both cases,

19

disclosure of the records sought will disclose the identity of persons with whom the government official has consulted, thereby disclosing the official's mental processes. In both cases, routine public disclosure of such records would interfere with the flow of information to the government official and intrude on the deliberative process." (*Id.* at pp. 479–480.)

The Court of Appeal found it immaterial that the request at issue was for only a year of telephone records as opposed to the five years of calendars in *Times Mirror*. (*Rogers*, *supra*, 19 Cal.App.4th at p. 480.) "Were we to conclude otherwise would permit petitioner to make sequential annual requests. It is the nonspecific and unfocused nature of the request which is dispositive, not its time period." (*Ibid.*) It also did not matter that *Times Mirror* involved the Governor as opposed to city council members: "[T]he deliberative process privilege is akin to the executive privilege on the one hand and the legislative mental processes privilege on the other. The legislative privilege necessarily involves large numbers of legislators. Accordingly, we do not find this distinction to be significant." (*Id.* at p. 481.)

### 3. *Labor & Workforce Development Agency*

In *Labor & Workforce Development Agency*, two companies filed PRA requests seeking information about Assembly Bill No. 1513, which contained a carve-out that had the effect of excluding the two companies from a wage-and-hour safe-harbor provision. (*Labor & Workforce Development Agency*, *supra*, 19 Cal.App.5th at p. 16.) The companies submitted requests seeking all public records relating to communications between the Labor & Workforce Development Agency (LWDA) and the United Farm Workers of America regarding Assembly Bill No. 1513, all records "referring or relating to" the carve-out, and

20

all public records "referring or relating to" Assembly Bill No. 1513. (*Labor & Workforce Development Agency*, at pp. 16–17.)

The LWDA provided the companies with some documents, but relied on, inter alia, the deliberative process privilege in withholding other documents. (*Labor & Workforce Development Agency*, *supra*, 19 Cal.App.5th at p. 18.) The companies then petitioned for a writ of mandate in the trial court seeking compliance with the PRA. (*Id.* at p. 20.) The trial court acknowledged the deliberative process privilege likely protected some of the withheld documents, but not all. (*Id.* at p. 21.) The trial court ordered the LWDA " 'to prepare and submit to [the companies] an index identifying the author, recipient (if any), general subject matter of the document, and the nature of the exemption claimed,' " after which the parties should " 'meet and confer and attempt to resolve any remaining disputes.' " (*Id.* at p. 22.)

In response to LWDA's request to clarify its order, the trial court stated, " 'The court finds the Agency's concerns about divulging the identities of "stakeholders" to be unfounded. In general, the identities of the stakeholders already are known. And to the extent they are unknown, the court is not persuaded that divulging the identities for purposes of a "privilege log" will have any significant "chilling effect" on the Agency's ability to have candid discussions with future stakeholders. . . .' " (*Labor & Workforce Development Agency*, *supra*, 19 Cal.App.5th at p. 22.)

The Court of Appeal vacated the trial court's order requiring LWDA to prepare the index. (*Labor & Workforce Development Agency*, *supra*, 19 Cal.App.5th at p. 36.) The court explained, "The Agency acted at the direction of the Governor in

formulating the policies to be codified by Assembly Bill 1513.  To this end, the Agency worked with key staff in the Governor's office and the Legislature.  The Agency also engaged in confidential communications with third parties regarding the issues relating to piece-work compensation that were to be addressed in Assembly Bill 1513.  These third parties had diverse and conflicting views regarding the proposed substance of Assembly Bill 1513.  Indeed, some individuals who communicated in confidence with the Agency represented constituencies that themselves had divided views on the aims of the legislation.  The information the Agency acquired in confidence was relied upon in its decisionmaking process and influenced the substantive choices of language for Assembly Bill 1513.  However, in the absence of confidentiality, the Agency would have received less candid input into the proposed legislation and may not have heard the viewpoints of persons who were knowledgeable about the issues but represented divided constituencies." (*Labor & Workforce Development Agency*, at p. 29.)

The appellate court disagreed with the trial court's conclusion that divulging the identities of those who met with the Agency regarding Assembly Bill No. 1513 would not impact the deliberative process.  (*Labor & Workforce Development Agency, supra*, 19 Cal.App.5th at p. 30.)  "The harm in revealing the identities of third parties who communicated confidentially with the Agency is that it will tend to dissuade stakeholders on issues subject to future legislative efforts from commenting frankly, or at all, on matters for which only varying viewpoints can provide a more complete picture.  As in *Times Mirror*, disclosing the identity of persons with whom the Agency 'has met and consulted is the functional equivalent of revealing the substance or

22

direction' of the Agency's 'judgment and mental processes.' [Citation.]" (*Ibid.*)

The appellate court further found no support in the record for the trial court's conclusion that the identities of the persons who met with the LWDA already were known, noting the Agency had provided a declaration stating, "[T]he third party communications were received in confidence and disclosure of the communicating parties 'would very likely cause retaliation in the form of harassment and ostracization from the representatives' *own* supporters.' " (*Labor & Workforce Development Agency*, *supra*, 19 Cal.App.5th at pp. 30–31.)

## C. The Trial Court Properly Granted EPI's Writ

### 1. EPI has not requested, nor has the trial court ordered disclosure of, Reynolds' meeting agendas

As an initial matter, we must clarify the scope of EPI's records request and the trial court's writ ordering disclosure, specifically whether the request seeks and the writ would require disclosure of meeting agendas or other information regarding the substance of the meetings.[4]  This clarification is important because the scope of EPI's request and the trial court's writ impacts analysis of the deliberative process privilege.  For the reasons that follow, we conclude that neither EPI's request nor

---

[4]  Neither the trial court nor the parties have defined the term "agenda," but we interpret it as having its common meaning, "a list or outline of things to be considered or done." (Merriam-Webster's Online Dict. (2023) <https://www.merriam-webster.com/dictionary/agenda> [as of Mar. 26, 2024], archived at <https://perma.cc/D6EQ-XS7H>.)

23

the trial court's writ requires disclosure of meeting agendas or other information revealing the substance of the meetings.

As discussed *ante*, in ruling on the Governor's invocation of the correspondence exemption, the trial court ruled that the Governor could redact any "email correspondence or messages" that were "directly viewable or accessible in a calendar event," but could not redact "basic calendar information—date, time, attendees, location and meeting agenda (as needed)."

The trial court used somewhat different language when, following its analysis of the deliberative process privilege, it issued the writ directing the Governor to produce the requested calendar events. The court stated, "[The Governor] may redact information not requested (i.e., meeting invitations) which may be viewable from the Outlook calendar entries. [¶] The court finds, and the writ shall specify, redactions of any calendar events may not include the invitees, attendees, time, date, location of the meeting, and meeting (as needed)."

The portion of the trial court's writ limiting the scope of allowable redactions is confusing. It largely mirrors the language from the court's discussion of the correspondence exemption, but omits the term "agenda." It is not clear on the face of the writ whether that omission was intentional; the sentence discussing redactions appears to be incomplete, stating "redactions . . . may not include the invitees, attendees, time, date, location of the meeting, and meeting (as needed)." Based on the court's earlier discussion of the correspondence exemption, one would expect the last few words of the sentence to read "meeting *agenda* (as needed)." (Italics added.)

The parties in their briefing do not address this ambiguity, and instead treat EPI's request and the trial court's writ as not

requiring the Governor to produce meeting agendas or other information disclosing the topics or substance of Reynolds' meetings with the 10 specified entities. At oral argument, both EPI and the Governor confirmed this is their reading of the trial court's writ.

The trial court's comments from the bench during the writ hearing similarly suggest the court did not intend its writ to encompass information that would disclose the substance of Reynolds' meetings. Towards the beginning of the hearing, when discussing its tentative ruling regarding the correspondence exemption, the court appeared to suggest, as had its tentative, that the Governor could not redact the names of the meeting participants, the meeting time and location, or the "meeting agenda as needed." Later in the hearing, however, when disagreeing with the Governor that the deliberative process privilege applied, the trial court stated the calendar events "just show[ ] that [Reynolds] met with [the 10 entities]. It doesn't show anything else." The court also acknowledged that if EPI's request had sought meetings on a "particular subject matter," for example "what days [Reynolds] met with . . . any of these ten representatives about net metering," "[t]hen you have got real deliberative process privilege issues." As formulated, however, the court appeared to conclude EPI's request would not reveal the substance of the meetings: "[T]hey could be talking about a whole host of things. [The requested records don't] expose the net metering issue or what the CPUC might have said." Later, the court stated, "You are never going to know because of deliberative process privilege what was discussed in the meeting so that the most that anyone could ever get is that they met."

These statements by the trial court are irreconcilable with an interpretation of the writ that would allow disclosure of the substance of Reynolds' meetings. We therefore conclude the trial court deliberately omitted the word "agenda" from the writ, and did not intend to prohibit the Governor from withholding or redacting agendas or other information regarding the substance or topics of Reynolds' meetings with the 10 entities. (See *Concerned Citizens Coalition of Stockton v. City of Stockton* (2005) 128 Cal.App.4th 70, 77 [" 'If the language of the order be in any degree uncertain, then reference may be had to the circumstances surrounding, and the court's intention in the making of the same.' "].) Alternatively, EPI has conceded that it has not requested information pertaining to the substance of Reynolds' meetings, and therefore agendas and the like are not responsive to EPI's request and need not be disclosed.

The question before us, then, is whether the deliberative process privilege shields the information the trial court *did* order disclosed regarding Reynolds' meetings with the 10 entities, namely "invitees, attendees, time, date, [and] location of the meeting." We turn to that question now.

2. **The public interest in nondisclosure does not clearly outweigh the public interest in disclosure**

The Governor contends the circumstances here are materially indistinguishable from those of *Times Mirror* and its progeny, and compel the conclusion that the public interest in withholding Reynolds' calendar entries clearly outweighs the public interest in their disclosure. The Governor argues that revealing the particular entities with whom Reynolds met, and the frequency of those meetings, would "expose the Governor's

26

and Ms. Reynolds' 'priorities and deliberative choices.' " The Governor further asserts disclosure of the calendar entries could deter the Governor or his senior staff from "meet[ing] with an unpopular or controversial group," or " 'deter some stakeholders from contacting the Governor's Office.' "

The Governor's argument, and Sapp's declaration below, track the policy arguments the Supreme Court found determinative in *Times Mirror*: Disclosure of everyone with whom a top-level official meets would allow the press and others to piece together the official's policy priorities, and would dissuade the official and third parties from meeting for fear of public scrutiny and criticism.

We acknowledge that EPI's request could intrude to a limited degree into the deliberative process of the Governor's office. EPI apparently seeks this information to determine how frequently the Governor's office interacted with the CPUC and energy stakeholders at the time the CPUC was formulating a new net metering tariff policy.

*Times Mirror* makes clear, however, the mere fact that a PRA request could intrude somewhat on the deliberative process does not, by itself, shield the requested documents from disclosure. The question is not simply " 'whether the disclosure of materials would expose an agency's decisionmaking process,' " but whether the disclosure would do so " 'in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions.' [Citation.]" (*Times Mirror*, *supra*, 53 Cal.3d at p. 1342.) The Supreme Court stated that a sufficiently narrow request might justify disclosure "whatever the incidental impact on the deliberative process." (*Id.* at pp. 1345–1346.)

27

We agree with the trial court that EPI's records request, which is far narrower than the unvarnished and broad requests at issue in *Times Mirror* or *Rogers*, mitigates the concern of " 'discourag[ing] candid discussion," and therefore reduces the public interest in nondisclosure.  EPI's request is directed not towards a top-level decisionmaker with a wide-ranging portfolio, but a senior advisor focused solely on energy issues.  EPI also has not requested the advisor's full calendars, but only those pertaining to the CPUC and specified utilities and energy-related unions.  One would expect the Governor's energy advisor to meet with energy regulators, producers, and unions on a variety of topics, regardless of the Governor's or the advisor's policy priorities.  Indeed, Sapp's declaration stated that meeting with "energy consumers, producers, regulators, [and] unions" is "[a] key responsibility of the Senior Advisor for Energy."  Thus, as the trial court stated, it is "unremarkable" that Reynolds met with these entities, and the fact of those meetings "does not disclose her overall thought processes given her position and its purview." This is particularly so because EPI's request, and the trial court's writ, do not require disclosure of the substance of any of the meetings.

Additionally, the intrusion on the deliberative process is limited because without Reynolds' full calendar for the year, which EPI expressly did not request, it is difficult to determine the extent to which Reynolds prioritized or focused on the 10 specified entities in comparison to all other parties with whom she may have met.  The Governor postulates that disclosure nevertheless could reveal Reynolds met with the CPUC more than with the specified utilities, or with those utilities more than the specified unions, or with one utility more than the others.

28

But without Reynolds' full calendar, disclosure will not show how the specified entities fit into Reynolds' overall portfolio. The intrusion into the deliberative process therefore is far less than in *Times Mirror*, which sought the Governor's complete calendar without limitation.

There also is no evidence suggesting that disclosure of the fact that Reynolds met with energy producers, regulators, and unions would discourage future meetings between those and similar energy-related entities and the Governor's energy advisor. Again, given that meeting with these sorts of entities is, as the Sapp declaration represented, a "key responsibility" of an energy advisor, and therefore presumably *any* Governor's energy advisor would meet with these entities regardless of policy positions or priorities, there is no indication those meetings would draw the level of scrutiny or criticism that might discourage the advisor and the entities from meeting in the future. This is not like *Labor & Workforce Development Agency*, in which the agency resisting disclosure submitted evidence that the particular meetings for which the records were requested were held in confidence with individuals who would suffer repercussions if their identities were known. (See *Labor & Workforce Development Agency*, *supra*, 19 Cal.App.5th at p. 31.) There is also no suggestion in the evidence that the 10 entities at issue in EPI's request are "politically unpopular or controversial group[s]" with whom the Governor's office would interact only in confidence. (*Times Mirror*, *supra*, 53 Cal.3d at p. 1344.)

On the other side of the scale, we agree with the trial court there is a substantial public interest in disclosure. First, as discussed, the public has a statutory and constitutional right to the disclosure of public documents, and we are to construe any

29

limits on that right narrowly.  (Cal. Const., art. I, § 3, subd. (b)(2); *Bd. of Supervisors*, *supra*, 2 Cal.5th at pp. 290–291.)  The deliberative process privilege itself applies only if the public interest in nondisclosure *clearly* outweighs the public interest in disclosure.  (§ 7922.000; *Times Mirror*, *supra*, 53 Cal.3d at p. 1339.)  Thus, even without EPI stating a specific reason for its PRA request, there already is weight on the scale in favor of disclosure that the Governor must overcome to assert the deliberative process privilege.

EPI has, however, stated a specific reason for its request, articulated by the trial court as "learning the extent to which the current president of the CPUC was meeting with the CPUC and the utilities regulated by the CPUC, as a Senior Advisor to the Governor, during the year preceding her appointment."

The CPUC "is not an ordinary administrative agency, but a constitutional body with broad legislative and judicial powers." (*Wise v. Pacific Gas & Electric Co.* (1999) 77 Cal.App.4th 287, 300; *BullsEye Telecom, Inc. v. Public Utilities Com.* (2021) 66 Cal.App.5th 301, 308 [CPUC " ' "is a state agency of constitutional origin with far-reaching duties, functions and powers" ' "]; see Cal. Const., art. XII, §§ 1–6.)  We agree there is a public interest in the extent to which the current CPUC president met with the CPUC and its regulated entities when she served as the Governor's senior energy advisor.

We therefore conclude, as did the trial court, that the public interest in nondisclosure in this case does not clearly outweigh the interest in disclosure.  In reaching this conclusion, we do not suggest any agreement with EPI's suspicion that energy stakeholders lobbied or swayed Reynolds in regard to net metering tariffs.  Independent of any intimation of purported

30

impropriety, the public has an interest in knowing the extent to which the Governor's energy advisor, whom he later appointed to lead the CPUC, interacted with the CPUC, energy utilities, or unions of energy workers in the year prior to her appointment. Our conclusion is based on the public's statutory and constitutional right to know how the government is conducting the people's business, and given the narrowness of EPI's request, the Governor has not shown an exemption abrogating that right.

Arguing to the contrary, the Governor reads *Times Mirror* to protect calendar entries from disclosure except in the " 'exceptional' " case. The Governor argues, "The point of the deliberative process privilege is to shield the policymaking process from all public intrusion." He contends a PRA request survives *Times Mirror* only if it "target[s] a narrow swath of records that relate to a matter of significant—and fact-based—public interest," a test he claims EPI's request does not meet.

We disagree that *Times Mirror* limits disclosure of calendar entries to the exceptional case. *Times Mirror* involved a request for five years' worth of the Governor's calendar entries with no limitations on subject matter, meeting participants, or otherwise, for no reason other than the public's entitlement to know how the Governor performs his duties and with whom the Governor meets. Under those circumstances, the Supreme Court held the deliberative process privilege shielded disclosure. Our high court expressly acknowledged a more limited request could overcome that privilege, and the court's holding should not be read to "render inviolate the Governor's calendars and schedules or other records of the Governor's office." (*Times Mirror, supra,* 53 Cal.3d at pp. 1345–1346.)

31

Here, as discussed, EPI's request was far more limited than that in *Times Mirror*, targeting one year of calendar entries for an advisor with solely an energy portfolio, and limited to meetings with the CPUC and nine other entities. EPI's request is thus not comparable to the request in *Times Mirror*.

The Governor argues *Times Mirror* requires proper PRA requests for officials' calendar entries to seek "specific information," and EPI's request is too broad to meet this test. The Governor contends limiting the request to an advisor focused solely on energy is insufficient because " 'energy' is a *category* of distinct and complex issues, ranging from labor issues to regulatory matters."

We do not dispute that "energy" is a broad topic involving many players. Our point in noting Reynolds' focus on energy is simply that it is "unremarkable," as the trial court put it, that an energy advisor would meet with energy regulators, producers, and unions. Records that those meetings took place disclose little if anything as to what particular subjects may have been discussed, or what the advisor's or Governor's policy goals were in holding those meetings.

The Governor argues *Times Mirror* contemplates that to overcome the deliberative process privilege, a request for calendar events and like records must specify a particular topic, but EPI's request seeks calendar records of Reynolds' meetings with the specified entities regardless of topic. The Governor characterizes this as a "fishing expedition."

Nowhere does *Times Mirror* state that PRA requests for the Governor's calendars (or those of his advisors) must specify a particular topic to overcome the deliberative process privilege. Given the unrestricted scope of the request found wanting in

*Times Mirror*, that opinion gives little guidance as to how much narrower a request need be to evade the privilege.

We further note that a request for calendar events pertaining to meetings on a specific topic could be a greater intrusion on the deliberative process than simply asking for when and where meetings took place with a limited number of entities within the executive agency's or official's purview. As illustrative, *Labor & Workforce Development Agency* held a request for the identities of individuals who communicated with the LWDA regarding specific legislation ran afoul of the deliberative process privilege. (*Labor & Workforce Development Agency*, *supra*, 19 Cal.App.5th at pp. 29–30.) The fact that EPI's request does not seek information regarding the substance of the meetings reduces its intrusion on the deliberative process and distinguishes it from the request in *Labor & Workforce Development Agency*.[5]

The Governor warns that if a PRA requestor can obtain records of a single advisor's meetings with specified entities, the requestor easily could evade the deliberative process privilege, and potentially determine the Governor's entire agenda, by filing a series of requests, each targeting a different advisor, a different time frame, or a different set of entities. To be clear, we do not hold that any request for calendar entries limited to a single advisor and specified entities defeats the deliberative process privilege. Our holding is based on the request at issue here, which concerns meetings between an energy advisor subsequently appointed to lead the CPUC and entities the energy

---

[5] This is not to say the deliberative process privilege necessarily would bar disclosure of calendar events on a specific topic, a question on which we express no opinion.

advisor 1) would meet with regardless of policy priorities, and 2) now leads or regulates as president of the CPUC. We think it unlikely those circumstances will be so commonplace as to allow serial PRA requests that could reveal substantial portions of the Governor's agenda. If the Governor believes a particular disclosure, combined with a previous disclosure, intrudes too deeply into the Governor's deliberative process, the Governor may raise that issue for the courts' consideration at the appropriate time. Nothing in our opinion would preclude such an argument or foreshadow how we would rule on it.

The Governor challenges the trial court's observation that the Governor submitted no evidence the entities identified in EPI's request intended their meetings with Reynolds to be in confidence, or that future meetings with those entities would be chilled by the disclosure of Reynolds' calendars. The Governor points out no such specific evidence was required in *Times Mirror*.

Again, *Times Mirror* involved a request for the wholesale disclosure of five years of the Governor's calendar events. In response to that broad and general request, the Supreme Court accepted the Governor's similarly broad declaration stating general policy reasons why disclosure of his calendar events would impede his deliberative process. Here, in contrast, EPI has narrowed its request to 10 entities. Far from providing evidence as to how disclosure of Reynolds' calendar would impact those and similar entities' willingness to meet with the Governor's office, Sapp's declaration acknowledged that meeting with these kinds of entities was part of Reynolds' job. We conclude, as did the trial court, that the Governor did not meet his burden to show

34

disclosure of the particular calendar events sought by EPI would impede the deliberative process.

The Governor argues EPI's assertion of a public interest in disclosure of Reynolds' calendar events is "rooted in rank speculation," because there is no evidence of any impropriety regarding the CPUC's net metering tariff policy. The Governor contends *Times Mirror*'s requirement that a requestor show a "more compelling" interest in disclosure must mean "a compelling interest *with a basis in fact.*" The Governor also contends that because the calendar events at issue would not reveal whether Reynolds discussed net metering tariffs with the CPUC or the other identified entities, "disclosing the calendar events would irreparably harm the Governor's deliberative process yet provide EPI no insight into whether Ms. Reynolds ever discussed net metering—the very information that EPI claims justifies disclosure."

We see nothing in *Times Mirror* requiring a PRA requestor to provide particular facts in support of its request. Assuming arguendo that is so, our conclusion in this case that there is a public interest in disclosure does not depend on speculation as to Reynolds' role in the CPUC's net metering tariff decision. Rather, it is based on the undisputed fact that Reynolds served as the Governor's senior energy advisor, in which role she interacted with energy producers, regulators, and unions, and subsequently the Governor appointed her to lead the CPUC. For the reasons set forth earlier, we disagree that disclosure of the requested calendar events would "irreparably harm the Governor's deliberative process."

The Governor further argues that absent the net metering tariff issue, EPI asserts only a "generic" public interest in how

35

Reynolds performed her duties, a public interest the Governor contends is insufficient under *Times Mirror*. According to the Governor, "The interest in protecting the deliberative process . . . presses upon the scale with greater force than other interests," and therefore "once an agency establishes that disclosure would intrude upon the deliberative process, the factual showing necessary to counterbalance the interest must necessarily be significant."

We disagree with the Governor's interpretation of *Times Mirror*. The deliberative process privilege, like any application of the PRA's catchall exemption, applies only when the public interest in nondisclosure *clearly* outweighs the public interest in disclosure. The high court in *Times Mirror* recognized the presumption in favor of disclosure, but held the deliberative process privilege prevailed given the unbridled request in that case.

To reiterate, EPI's narrow request intrudes minimally into the Governor's deliberative process, and therefore the public interest in nondisclosure of Reynolds' calendars is necessarily far less than in *Times Mirror*. Further, the public interest in disclosure in this case is both more specific and more compelling than the public interest in *Times Mirror*. In *Times Mirror*, the interest asserted by the newspaper was a general interest in how the Governor " 'performs his duties, including the identity of persons with whom he meets in the performance of his duties as Governor.' " (*Times Mirror*, *supra*, 53 Cal.3d at p. 1344.) Here, in contrast, the open government principles underlying the PRA underscore the public interest in knowing whether Reynolds on behalf of the Governor interacted with the entities she now leads and/or regulates. Again, the request here is distinguishable from

36

that of *Times Mirror*, and our holding therefore is not inconsistent with that authority.

The Governor notes that in *Rogers*, the PRA requestor asserted a public interest in determining whether city councilmembers had communicated with certain special interests, and the Court of Appeal held that interest insufficient to overcome the deliberative process privilege. The Governor argues that, to the extent EPI asserts an interest in knowing whether Reynolds communicated with energy special interests, the deliberative process privilege would prevail under *Rogers*.

*Rogers* is distinguishable. In that case, although the PRA requestor claimed to be seeking information about city councilmembers' communications with particular individuals or entities, the request was not limited to those communications, and similar to *Times Mirror,* sought *all* telephone communications, regardless of topic or participant, between city councilmembers and third parties over the course of a year. (*Rogers*, *supra*, 19 Cal.App.4th at p. 474.) The Court of Appeal held the deliberative process privilege applied, and "the nonspecific and unfocused nature of the request" was "dispositive." (*Id.* at p. 480.) Although the requestor offered to disclose to the trial court "the focus of his request" so the court "could intelligently review the telephone records in camera," the Court of Appeal held this was improper, and the requestor "should have presented a specific and focused request to the City," not to the trial court. (*Id.* at pp. 480–481.) *Rogers* did not confront the circumstances of the instant case, in which EPI has submitted a narrow request for meetings between an advisor and 10 specific entities whom that advisor went on to lead or regulate. In sum, our holding does not conflict with *Rogers*.

In light of the foregoing, we conclude the trial court did not err in granting EPI's writ petition.

## DISPOSITION

The Governor's petition for a writ of mandate is denied. Real Party in Interest Energy and Policy Institute is awarded its costs in this proceeding.

<u>CERTIFIED FOR PUBLICATION.</u>

BENDIX, J.

We concur:

ROTHSCHILD, P. J.

CHANEY, J.